Filed 6/10/22  P. v. Olivera CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>BLISELDA MARIA OLIVERA,<br><br>  Defendant and Appellant. | F081186<br><br>(Super. Ct. No. F18905181)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  David Andrew Gottlieb, Judge.

Aaron J. Schechter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

On June 11, 2018, defendant Bliselda Maria Olivera drove her vehicle at Nora O.,[1] causing Nora to jump out of the way to avoid being hit by the vehicle.  A jury convicted defendant of assault with a deadly weapon and the trial court sentenced defendant to a three-year term of probation.  Defendant contends on appeal that (1) the trial court violated her right to be personally present at trial by continuing to select the jury in her absence after she overslept and was five hours late for trial; (2) defense counsel was constitutionally ineffective when he implicitly agreed to continue jury selection in her absence; (3) the trial court erred in instructing the jury on assault with a deadly weapon by omitting reference to the term "deadly weapon"; (4) the trial court erred in failing to instruct the jury as to the lesser included offense of simple assault; (5) the cumulative impact of the instructional errors violated defendant's right to due process; (6) the lifetime suspension of defendant's driving privilege violates equal protection principles; (7) the trial court exceeded its authority in ordering the Department of Motor Vehicles (DMV) to revoke defendant's driver's license; (8) we should strike the electronic search condition imposed as part of her probation as overbroad; and (9) her term of probation must be modified to two years pursuant to Penal Code section 1203.1, subdivision (a),[2] as amended by Assembly Bill No. 1950 (2019−2020 Reg. Sess.).

We shall reduce defendant's term of probation to two years, reverse the trial court's order revoking defendant's driver's license, and order the trial court to amend its May 4, 2020 minute order to delete the language:  "DMV to Revoke Drivers License for a period of [*sic*] As to count(s):  001."  The trial court is directed to insert in the minute order a statement that defendant was convicted of a felony violation of section 245,

---

[1]     Pursuant to California Rules of Court, rule 8.90, we refer to the victim and witnesses by their first names and last initials and thereafter by their first names.  No disrespect is intended.

[2]     Undesignated statutory references are to the Penal Code.

2.

subdivision (a)(1) and the court found a vehicle constituted the deadly weapon or instrument used to commit the offense.  In all other respects, we affirm the judgment.

## PROCEDURAL BACKGROUND

The District Attorney of Fresno County filed an information on March 15, 2019, charging defendant with assault with a deadly weapon (§ 245, subd. (a)(1)).  After a four-day trial, the jury convicted defendant of the charge on January 28, 2020.  On May 4, 2020, the trial court suspended imposition of sentence and placed defendant on formal probation for three years, including conditions that she serve 300 days in the county jail (with 213 days credit for time served) and that she submit to the search of handheld electronic devices.  The court also imposed a $300 restitution fine (former § 1202.4, subd. (b)), a stayed $300 probation revocation restitution fine (§ 1202.45, subd. (a)), victim restitution as determined by probation (former § 1202.4, subd. (f)(2)), a $40 court operations assessment (§ 1465.8), and a $30 criminal conviction assessment (Gov. Code, § 70373).[3]  In addition, the court ordered the DMV to revoke defendant's driver's license for life.

Defendant filed this timely appeal on May 19, 2020.

## FACTS

Nora testified that at approximately 5:00 p.m. on June 11, 2018, defendant called William G.'s (Nora's husband's) cellular phone.  Defendant was married to Martine G., William's cousin.  Nora spoke to defendant and both women ended up yelling and cussing at each other.[4]  Defendant suggested that Nora come to defendant's house to

---

[3]     The trial court also sentenced defendant on a separate case and imposed a $40 court operations assessment (§ 1465.8) and a $30 criminal conviction assessment (Gov. Code, § 70373) in relation to that case as well.

[4]     Nora denied having told the police that she did not like William receiving calls from women.  She explained that she did not like either defendant or Martine and felt that Martine, not defendant, should have called her husband.

settle the matter, and Nora said she would but had no intention of going to defendant's house.

Thereafter, Nora used her child's scooter to travel to the mailboxes around the corner from her residence. As she returned to her residence, Nora saw defendant's red vehicle in the street a short distance away. Martine, defendant's husband, got out of the vehicle and walked away down the street. Nora felt that defendant was stalking her and angrily yelled, "come on," meaning, "if we're going to talk, let's talk" and did not intend to fight. Nora stood on the sidewalk as defendant then drove the vehicle at Nora in such a way as to cause her to contemplate whether to jump onto the hood of the vehicle or away from the vehicle. Nora testified that she did not remember hearing anything and could not remember the speed at which Nora drove the vehicle when it came at her. When the vehicle was within three feet of her, Nora dropped the scooter and jumped out of the way. The vehicle stopped on the sidewalk. Nora noticed that the scooter was bent in the middle, twisted, and no longer operational, but she did not see whether the vehicle hit the scooter or ran it over. Nora also observed tire marks from defendant's vehicle at the edge of the sidewalk.

Defendant then backed the vehicle into the road, got out of the vehicle, and started verbally and physically fighting with Nora. Defendant grabbed Nora's hair and dragged her head down to hit her with a knee, but William got between them. Defendant then got back into her vehicle and left the area. Defendant never apologized or indicated that she did not intend to run over Nora.

William, Nora's husband, testified that he received a call from defendant and Nora answered the phone. He heard screaming in the background and then Nora and defendant arguing. Nora and defendant were not on friendly terms. William and Nora had an agreement not to receive calls from members of the opposite sex. He took Nora into the backyard to calm her down and, after a few minutes, Nora took off on a scooter to check the mail.

William walked out to the driveway and saw Nora returning. She yelled to him, "That bitch is here." William observed the front end of a red vehicle that he knew belonged to defendant across the street, approximately 90 to 100 feet from Nora. After Nora yelled "come on," William heard the vehicle "rev up" twice, and then defendant drove toward Nora. Defendant was driving very fast, at least 30 miles per hour, and did not attempt to swerve or turn from Nora.

William ran toward Nora and yelled, "Get out of the way." The vehicle jumped the curb and Nora flew backwards. William testified that the vehicle hit a rock and would have hit Nora if the rock had not been there. The scooter was bent and wedged against the rock. Defendant backed her vehicle into the road, parked, and then approached Nora. Both women started fighting. William separated the women and told defendant to leave. He then called the police and told them someone had tried to run over his wife.

Cody W. lived on the corner near Nora. He heard an engine revving for about 15 seconds and then tires squealing. Cody looked out his window and saw a red vehicle driving toward his neighbor. He saw the vehicle back up and park and then the driver got out and fought with his neighbor. The driver had the neighbor on the ground by her hair.

Defendant testified that she was friends with William but had never met Nora and did not have a relationship with her. Defendant called William at Martine's request and left a message that William could pick up his things in a few hours because Martine and defendant were going out. Defendant received a call from William's phone and a woman asked who she was and then said, " 'Oh, hell no. You better not be calling my husband.' " Nora called back and yelled and cussed at defendant again. Nora taunted defendant and said she would go over and "beat [defendant's] ass." Nora told defendant to come to her house, and Martine told defendant how to get there.

Defendant went to Nora's house to explain why she called William and to tell Nora not to speak to her as Nora had in the phone calls. Defendant let Martine out of the

vehicle because he did not want to be involved.  Defendant's vehicle was still running when she saw Nora, and Nora started yelling at her.  Defendant's vehicle was in first gear and she never turned off the ignition.  Nora yelled at defendant to come to her.  Defendant drove toward Nora but did not intend to run her over, defendant was just trying to get to Nora faster to engage in a physical altercation.  Defendant testified, "I figured if I just drove over there quickly, I'd just get to [Nora], beat her up and then get in my car and leave.  That was my intention."

Defendant always revved her engine to ensure that she did not pop the clutch because she was still learning to drive a clutch.  Defendant estimated that she was only driving 15 miles per hour.  Defendant admitted that she was interviewed and told the detective that she was driving 25 miles per hour.  She accelerated in order to put the vehicle in second gear, but before she could, she got too close to the curb.  Defendant intended to turn the vehicle and park at the sidewalk, but the vehicle would not stop or turn and she only stopped it by throwing on the emergency brake.  Defendant surmised that the vehicle must have "locked up or something" and "was incapable of being [driven] after that."  When cross-examined, defendant admitted that she drove the vehicle that evening out of town for more than two hours and her brakes worked at that time.

Defendant testified that she struck Nora and then grabbed her hair.  Defendant left when William told her he had called the police.

## DISCUSSION

I.   *The trial court did not violate defendant's right to be personally present during her trial when it continued jury selection after defendant voluntarily absented herself from the proceedings.*

### A.   Background

Jury selection commenced at 1:35 p.m. on January 23, 2020, with one break between 2:45 p.m. and 3:00 p.m.  The trial court first addressed those prospective jurors with hardship excuses.  Voir dire commenced and, thereafter, the trial court excused one

6.

prospective juror for prejudice and the parties each exercised three peremptory challenges. The trial court replaced the seven excused prospective jurors. Before adjourning for the day, at 4:00 p.m., the trial court ordered the prospective jurors to return at 9:00 a.m. the next day. Prior to commencement of jury selection, the trial court advised defendant and counsel that they would reconvene at 8:30 a.m. the next day, although the jury would not be present until 9:00 a.m.

On January 24, 2020, at 8:44 a.m., the trial court reconvened. Defendant was not present. The court noted that defendant had not yet appeared and suggested she may have believed that court would commence at 9:00 a.m. Defense counsel waived defendant's presence "for preliminary issues."[5] The court then stated, "So I know that there were a couple of challenges for cause that the Court said that we would address this morning. I believe that it was [prospective] juror number ****5 and [prospective] juror number ****1." After argument by defense counsel, the trial court denied defendant's challenges for cause. Both defense counsel and prosecutor indicated they had no further issues.

The trial court resumed with the prospective jurors present at 9:05 a.m. The court advised the prospective jurors to not speculate on defendant's absence and that they were "going to continue though [*sic*] with jury selection process at this point in time." The trial court asked if either counsel wished to be heard, but neither did. Voir dire continued. The parties each exercised three peremptory challenges, and the court released the prospective jurors until 10:26 a.m. The trial court excused one prospective juror for cause and one for hardship. The court then asked defense counsel whether he had been able to contact defendant. Defense counsel responded that he had called the one

---

**5**     The record is not clear if the trial court was referring to the discussion concerning excusing the prospective jurors in seats 1 and 5 for cause and/or to proceed with voir dire.

7.

number he had for defendant, but the number was disconnected. Defense counsel advised that he would use the break to contact his office and see if defendant had called.

Court resumed at 10:26 a.m., and the trial court called seven additional prospective jurors for questioning. Five prospective jurors were excused for cause, and the parties exercised one peremptory challenge each. The trial court released the prospective jurors at 11:31 a.m. with instructions to return at 1:30 p.m. The court addressed the parties:

> "THE COURT: We're still on the record outside of the presence of the [prospective] jur[ors]. So to put on the record what we discussed off the record and that is that [] defendant has not been here all morning. The Court made a decision to go forward with choosing a jury. The jury has not been sworn in, so jeopardy has not yet attached. It's the Court's understanding from defense counsel that he has had contact with [] defendant and it is anticipated that she will be here at 1:30[ p.m]. My thoughts are that maybe she should be here at 1:15[ p.m.], we can go on the record at 1:15[ p.m.], and make a short record about how we plan to deal with it."

The prosecutor advised the court that defendant had been late multiple times and admonished multiple times. One time, defendant did not arrive until 9:30 a.m. and was admonished by the court. The next day, however, defendant did not arrive until 8:45 a.m. "even though she was admonished again on the prior court date that she ha[d] to be [t]here at or before 8:30[ a.m]." The trial court expressed concern and indicated that it would review the court records to determine whether to remand defendant to prevent further court delays. The court agreed to address the matter at a later time. Defense counsel advised the court that he was not aware defendant moved to the Bay Area and offered that defendant may have believed timeliness was not an issue since other court appearances were on a calendar where multiple cases were heard before her case was called. The court replied, "[D]espite the fact that we had the discussion here yesterday to be here on time and she knew that she was the only one, she was the star attraction, …

8.

but it seems to me as though she just kind of decides, you know, I'll get there when I get there."

Court resumed at 1:25 p.m. outside the presence of the prospective jurors. The trial court addressed defendant who was then present:

> "I'm not going to go too detailed into what the situation is, but you caused your case to pose some challenges for everybody by your nonappearance here. I don't understand why you wouldn't be here and why you wouldn't contact your attorney as soon as there was any problems developing. I'm a little bit concerned because you had also told the Court that you were going to be staying here local, at least between yesterday and today, and then I found out you did not stay local. We're going to address all of these things at the end of the day and I'll determine whether or not you will remain out on your bond or whether you will be remanded into custody. But it has been an inconvenience for all of us and concerning to the Court, because, quite honestly, I didn't know if we would be able to continue with your trial or whether I would have to discharge this panel who would have spent almost a full day in this courtroom going through this process without you here.

> "It also, of course, ha[d] an impact on selection of jury. Your attorney was in a position where he was required to continue to select a jury without your presence because you decided not to be here."

The trial court asked defense counsel to explain defendant's absence. Defense counsel explained that defendant had contacted his office at approximately 9:30 a.m. and left a message; he saw the text message from his office at midmorning break, between 10:00 a.m. and 10:26 a.m. Defense counsel called the number defendant provided and spoke with Martine, who explained that they were driving through Pacheco Pass.[6] Martine advised defense counsel that defendant should arrive in about one hour. The court deferred a decision on defendant's custodial status until the end of the day.

Trial resumed at 1:37 p.m., and the trial court instructed the jury not to speculate as to the reasons for defendant's absence that morning. The selected prospective jurors

---

[6] Pacheco Pass is located between the Bay Area and Fresno, approximately two to two and one-half hours from Fresno Superior Court.

9.

were sworn. The trial court excused the jury for the day at 4:00 p.m. and remained in session to address defendant's custodial status. The court asked for an explanation as to why defendant was not in court at 8:30 a.m. to continue jury selection when defendant had advised the court that she would be staying in Fresno overnight. Defendant responded that she went back to the Bay Area because her daughter's father did not show up to care for defendant's daughter until 2:00 a.m. Defendant then went to bed and did not hear the alarm, and "[h]e didn't wake me up and [she] ended up rushing out the door." The trial court noted that defendant failed to appear two times in the instant case and was permitted to repost her bond. Defendant also had a failure to appear in a second case and her bond was reinstated. The court noted that defendant committed an offense while on bond on the instant case and failed to keep defense counsel advised of her whereabouts or contact information. In addition, the court commented, "I think it was abundantly clear to her when she was on trial track, both in Judge Harrell's court and in this Court, that we expected her to be on time. She also heard me tell all of the jurors that we can't start without them and of course we can't start without her." The court expressed concern that defendant "was not able to participate in the selection of the jury at least to a certain extent," but it "believe[d] that counsel waived that." The court also stated:

> "Her excuse for not getting here was because her alarm clock didn't go off. To me that is a horrible excuse. When you're talking about a case of such importance and involving so many people, you need to have two or three safeguards to make sure that you get to where you need to get on the right time. If it had been anybody else, they probably would have left the Bay Area at 2 o'clock in order to make sure that they were here in a timely manner."

### B. Applicable Law and Standard of Review

"A criminal defendant, broadly stated, has a right to be personally present at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, as applied to the states through the due

10.

process clause of the Fourteenth Amendment; the due process clause of the Fourteenth Amendment itself; section 15 of article I of the California Constitution; and sections 977 and 1043 of the Penal Code." (*People v. Waidla* (2000) 22 Cal.4th 690, 741.) Voir dire of prospective jurors is " 'a critical stage of the criminal proceeding, during which the defendant has a constitutional right to be present.' " (*People v. Wall* (2017) 3 Cal.5th 1048, 1059.)

"Our state Constitution guarantees that '[t]he defendant in a criminal cause has the right … to be personally present with counsel, and to be confronted with the witnesses against the defendant.' (Cal. Const., art. I, § 15.)" (*People v. Gutierrez* (2003) 29 Cal.4th 1196, 1202 (*Gutierrez*).) " 'The state constitutional right to be present at trial is generally coextensive with the federal due process right.' " (*People v. Butler* (2009) 46 Cal.4th 847, 861.) "Sections 977 and 1043 implement the state constitutional protection. [Citation.] Section 977, subdivision (b)(1), provides: 'In all cases in which a felony is charged, the accused shall be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence.…' Section 1043, subdivision (a), states that '[e]xcept as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial.' " (*Gutierrez*, at p. 1202.)

Although a defendant has a right to be present at trial and subsequent proceedings, "the right is not an absolute one. [Citation.] It may be expressly or impliedly waived." (*People v. Espinoza* (2016) 1 Cal.5th 61, 72 (*Espinoza*).) " ' "[I]f a defendant at liberty remains away during h[er] trial the court may proceed provided it is clearly established that h[er] absence is voluntary. [S]he must be aware of the processes taking place, of h[er] right and of h[er] obligation to be present, and [s]he must have no sound reason for remaining away." ' " (*Id*. at pp. 73–74.) "No more [is] constitutionally required." (*Id*. at p. 74.) "Section 1043[, subd. ](b)(2) has adopted this … rule as state law." (*Id*. at p. 72.) Under that provision, a defendant's absence "in a felony case after the trial has

commenced in their presence shall not prevent continuing the trial to, and including, the return of the verdict in … [¶] … [¶] … [a]ny prosecution for an offense which is not punishable by death in which the defendant is voluntarily absent." (§ 1043, subd. (b)(2).)[7]

We look to the totality of the facts in determining whether a defendant is absent voluntarily. (*Espinoza*, *supra*, 1 Cal.5th at p. 72.) "The role of an appellate court in reviewing a finding of voluntary absence is a limited one. Review is restricted to determining whether the finding is supported by substantial evidence." (*Id*. at p. 74.)

### C. Analysis

We conclude that the court did not err by proceeding with voir dire during defendant's absence from the courtroom because it impliedly deemed defendant voluntarily absent. As set forth above, the court had previously informed defendant to be present the next day at 8:30 a.m. When the trial court commenced proceedings at 8:44 a.m., the trial court gave defendant the benefit of the doubt that perhaps she had mistaken the start time of the trial. However, when defendant had not arrived, the trial court continued voir dire in her absence at 9:05 a.m. When the court proceeded without her, it had no information regarding the cause of her delay because defense counsel was equally uninformed as to the reason. The trial court knew it had advised everyone in the courtroom that lateness on anyone's part could impact the proceedings.

When defendant did arrive, five minutes before the afternoon trial session was to commence, she did not offer an explanation for her absence nor object to the proceedings that took place in her absence. After the trial recessed for the day, defendant advised the court that despite assurances that she would be staying in town for the trial, she traveled

---

[7]    Contrary to defendant's argument, section 977 did not require defendant to execute a written waiver of her right to be present. Where the trial has commenced in defendant's presence, section 1043 applies to determine whether defendant's absence was voluntary thereby waiving her right to be present. (*Gutierrez*, *supra*, 29 Cal.4th at pp. 1202–1203.)

to the Bay Area out of concern for her daughter.[8]  Defendant then overslept.  While evidence showed that defendant had contacted her counsel's office at approximately 9:30 a.m., she did not attempt to explain why she could not have contacted her attorney before court commenced.

The trial court described defendant's excuse that she was late because her alarm clock failed to go off as "a horrible excuse."  We conclude that ample facts supported the court's decision to proceed with voir dire based on the information available to it contemporaneously as well as the information it subsequently learned regarding defendant's absence.  "Here the record, which we have described, supports the trial court's view that defendant was ' "aware of the processes taking place," ' that [s]he knew ' "h[er] right and of h[er] obligation to be present," ' and that [s]he had ' "no sound reason for remaining away." ' [Citation.]  As such, defendant implicitly waived h[er] right to be present.  [Citation.]  No more was constitutionally required." (*Espinoza*, *supra*, 1 Cal.5th at p. 74.)

Defendant does not challenge the trial court's conclusion that her failure to appear on time for trial was voluntary.  Rather, defendant argues that we are limited to the information available to the trial court when it made the decision to proceed with defendant's trial in her absence and "after-the-fact information is wholly irrelevant to assessing the propriety of the trial court's action."  Defendant fails to cite authority for this limitation on our review, and we reject it.

Defendant's argument has been rejected in *People v. Connolly* (1973) 36 Cal.App.3d 379.  In that case, Connolly argued that at the time the trial court initially learned he was absent, it did not have sufficient facts to determine that his absence was voluntary.  (*Id*. at p. 384.)  The court rejected that argument, as do we.  "Unquestionably

---

**8**     Defendant only explained that her daughter's father had not arrived to care for her but did not provide any information regarding her daughter's age or health, or whether anyone else was available to care for her daughter.

13.

section 1043, subdivision (b)(2) was designed to prevent the defendant from intentionally frustrating the orderly processes of h[er] trial by voluntarily absenting h[er]self. A crucial question must always be, 'Why is the defendant absent?' This question rarely can be answered at the time the court must determine whether the trial should proceed. Consequently, in reviewing a challenge to the continuation of a trial pursuant to Penal Code section 1043, subdivision (b)(2), it must be recognized that the court's initial determination is not conclusive in that, upon the subsequent appearance of the defendant, additional information may be presented which either affirms the initial decision of the court or demands that defendant be given a new trial. It is the totality of the record that must be reviewed in determining whether the absence was voluntary." (*Id*. at pp. 384–385.)

Thus, the reviewing court considers not only the information available to the trial court at the time of its decision but any additional information presented at the time of the defendant's subsequent appearance that either affirms the initial decision of the court or demands that the defendant be given a new trial. (See *People v. Pigage* (2003) 112 Cal.App.4th 1359, 1369; *Espinoza*, *supra*, 1 Cal.5th at p. 72 [" 'In determining whether a defendant is absent voluntarily, a court must look at the "totality of the facts." ' "].)

We conclude that substantial evidence supported the trial court's implicit finding that defendant voluntarily absented herself from the conclusion of jury selection and resulted in her waiver of her right to be present.

II. ***Even if defense counsel provided ineffective assistance of counsel by failing to object to proceeding with the trial in defendant's absence, defendant has not shown prejudice from such failure.***

Defendant argues that she received ineffective assistance of counsel because trial counsel "implicitly assented to the resumption of voir dire in [her] absence, without any attempt to ascertain [her] whereabouts." We reject defendant's claim.

14.

## A.    Applicable Law and Standard of Review

"In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance." (*People v. Mickel* (2016) 2 Cal.5th 181, 198, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–692.)  "To demonstrate deficient performance, defendant bears the burden of showing that counsel's performance ' " ' "fell below an objective standard of reasonableness … under prevailing professional norms." ' " ' [Citation.]  To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*Mickel*, at p. 198.)

We may reject the claim without determining the adequacy of counsel's performance if defendant fails to show prejudice." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 697.)

## B.    Analysis

Defendant argues that defense counsel was ineffective in not attempting to contact her before implicitly agreeing to proceed in her absence.  However, the record fails to demonstrate that had counsel done so, that the outcome of the trial or even the court's decision to proceed would have been different.

In arguing that she was prejudiced by defense counsel's actions, defendant relies upon the same harmless error analysis applied where the trial court has violated a defendant's constitutional right to be present at trial.  Citing *Hager v. United States* (D.C. 2013) 79 A.3d 296, defendant argues that the analysis focuses "on the degree to which, despite error, the defendant was able to meaningfully participate in voir dire." (*Id*. at p. 303.)  However, we have already concluded that defendant's constitutional right to be present at trial has not been violated and defendant voluntarily absented herself from the proceedings by not taking care to arrive on time.  Therefore, our prejudice analysis does

15.

not focus on the effect of defendant missing the proceedings, but whether she was prejudiced by defense counsel's failure to object to proceeding in her absence.

We note that during the first break, defense counsel advised the trial court that he had attempted to contact defendant, although the record is not clear as to whether he did so before trial commenced at 9:05 a.m. However, since defense counsel reported that defendant's number had been disconnected, we cannot see that any call, even if earlier, would have provided defense counsel information as to defendant's absence. In addition, defendant did not even contact defense counsel's office until at least 9:30 a.m., an hour after trial was to commence.

Even assuming that defense counsel had reached defendant and obtained the information that she had slept through her alarm clock, we conclude that providing that information to the trial court would not have affected the trial court's decision to proceed with the jury selection. Defendant had advised the trial court the evening before that she would be staying in town overnight. The trial court would have been aware that defendant did not mistakenly believe trial was to resume at 9:00 a.m. when she failed to appear by 9:05 a.m. Considering that defendant lived in the Bay Area (approximately three hours from Fresno depending on traffic), it is not unreasonable to assume that at the time trial was to commence, defendant was either still asleep or more than two hours from Fresno.[9] Given that the trial court believed that defendant's stated excuse of sleeping through her alarm was "a horrible excuse," we do not believe that the trial court would have kept the jury panel waiting two to three hours for defendant to arrive.

Therefore, defendant has failed to demonstrate any prejudice from her counsel's failure to object to proceeding in her absence without first attempting to contact her.

---

[9]     If we assume that defendant would have attempted to contact her attorney's office when she first determined she had overslept and would not appear on time, she was still at home at 9:30 a.m.

16.

Defense counsel did not provide defendant constitutionally ineffective assistance of counsel.[10]

### III. *Any error in the trial court's instruction to the jury on the elements of assault with a deadly weapon was harmless.*

Defendant argues that the trial court's modification of CALCRIM No. 875 omitted an element of the offense, that is, that the jury needed to determine if defendant did an act "with a deadly weapon" by using her vehicle in the manner she did. The People argue that while the court's instructions deviated from the standard instructions, in the context of the instructions as a whole and the trial record, the jury could not have failed to recognize that it had to find that defendant's vehicle was a deadly weapon in order to convict. We need not determine whether the trial court erred in instructing the jury because we conclude, even if the instructions omitted an element of the offense, the error was harmless beyond a reasonable doubt.[11]

#### A. Background

##### 1. *The Trial Court's Instruction to the Jury*

The trial court instructed the jurors with a modified version of CALCRIM No. 875 as to the crime of assault with a deadly weapon:[12]

> "[D]efendant is charged in Count One with assault with a vehicle in violation of Penal Code section 245[, subdivision ](a) (1).

---

**10** Defendant filed a petition for a writ of habeas corpus on February 1, 2021 (case No. F082315), that largely repeats her contention regarding her ineffective assistance of counsel claim and provides a declaration of counsel explaining the reason for proceeding in defendant's absence. We previously issued an order stating the petition would be considered concurrently with this appeal. Because defendant has failed to establish prejudice by counsel's decision, in a separate order, filed concurrently with this opinion, we have denied the petition for writ of habeas corpus.

**11** In light of our decision on the merits, we decline to reach the People's alternate argument that defendant forfeited this claim of error by failing to object to the court's instruction.

**12** This same instruction, worded exactly the same, was also read to the jury before opening statements.

17.

"To prove that [] defendant is guilty of this crime, the People must prove that:

"[D]efendant did an act that by its nature would directly and probably result in the application of force to a person, and [] defendant did that act willfully. When [] defendant acted, she was aware of facts that would lead a reasonable person to realize that her act by its nature would directly and probably result in the application of force to someone. When [] defendant acted, she had the present ability to apply force with her vehicle to a person.

"[¶] … [¶]

"A deadly weapon is any object, instrument, or weapon that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.

"In deciding whether an object is a deadly weapon, consider all the surrounding circumstances."

CALCRIM No. 875 includes several parenthetical sections that the court either did not include or modified when instructing the jury:

"The defendant is charged [in Count _____] with assault with ( … /a deadly weapon other than a firearm/ … [in violation of Penal Code section 245].

"To prove that the defendant is guilty of this crime, the People must prove that:

"*<Alternative 1A—force with weapon>*

"[1.    The defendant did an act with (a deadly weapon other than a firearm/ … ) that by its nature would directly and probably result in the application of force to a person;]

"[¶] … [¶]

"4.    When the defendant acted, (he/she) had the present ability to apply force ( … /with a deadly weapon other than a firearm … ) to a person(;/.)"  (CALCRIM No. 875, boldface omitted.)

The bench notes to CALCRIM. No. 875 direct the trial court to provide the bracketed definitions where relevant and "[g]ive element 1A if it is alleged the assault was

18.

committed with a deadly weapon other than a firearm." (Judicial Council of Cal., Crim. Jury Instns. (2020) Bench Notes to CALCRIM No. 875, p. 629.)

A comparison of the two instructions reveals that the trial court called the offense "assault with a vehicle" as opposed to "assault with a deadly weapon other than a firearm." The trial court also instructed, as to element 1, that "defendant did an act" as opposed to "defendant did an act with a deadly weapon other than a firearm" and, as to element 4, instructed that defendant had the "present ability to apply force with her vehicle to a person" rather than instructing that defendant had "the present ability to apply force with a deadly weapon other than a firearm." As a result of these changes, the trial court never used the term "assault with a deadly weapon other than a firearm" when instructing as to the four elements of the offense but did include the definition of deadly weapon applicable when the weapon is not inherently deadly.

### B.    Standard of Review and Applicable Law

Trial courts have a sua sponte duty to instruct " 'on those general principles of law that are closely and openly connected with the facts before the court and necessary for the jury's understanding of the case.' " (*People v. Simon* (2016) 1 Cal.5th 98, 143.) A court is not required to define commonly used words with no technical meaning peculiar to the law in the absence of a request. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1050–1051.)

For purposes of " 'section 245, subdivision (a)(1), a "deadly weapon" is "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." ' " (*In re B.M.* (2018) 6 Cal.5th 528, 532–533.) " 'In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue.' " (*Id.* at p. 533.) A vehicle is a deadly weapon when used in a manner likely to produce death or great bodily injury. (See *People v. Tahl* (1967) 65 Cal.2d 719, 734; *People v. Russell* (2005)

129 Cal.App.4th 776, 782.) Great bodily injury means significant or substantial physical injury—an injury that is greater than minor or moderate harm. (CALCRIM No. 875.) "[S]ome physical pain or damage, such as lacerations, bruises, or abrasions is sufficient for a finding of 'great bodily injury.' " (*People v. Washington* (2012) 210 Cal.App.4th 1042, 1047.)

The trial court's failure to instruct the jury that it needed to determine whether defendant used the vehicle as a deadly weapon is subject to harmless error analysis under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24. Under the *Chapman* standard, we "must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt* (2017) 2 Cal.5th 819, 831.) "[I]n order to conclude that an instructional error ' "did not contribute to the verdict" ' within the meaning of *Chapman* [citation] we must ' "find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record" ' [citation]." (*People v. Brooks* (2017) 3 Cal.5th 1, 70.)

### C. Analysis

In this case, we have no difficulty concluding that even if the trial court erred in instructing the jury as to the elements of the offense, any such error was harmless beyond a reasonable doubt.

In the first place, the "deadly weapon" element of the charge was not disputed at trial. (See *Neder v. United States* (1999) 527 U.S. 1, 15 [omission of the element of "materiality" did not warrant reversal where defendant did not contest materiality at trial].) Defense counsel explained to the jury, "You're being asked to decide whether [defendant] is guilty of assault with a deadly weapon as those instructions have been read out to you several times. And really you're being asked to decide whether [defendant's] conduct was willful and that's really the primary defense."

20.

The jury had been instructed that assault with a deadly weapon had four elements: (1) defendant committed an act that by its nature would result in the application of force to a person; (2) defendant acted willfully;[13] (3) when defendant acted, she was aware of facts that would lead a reasonable person to realize her act would result in the application of force to a person; and (4) defendant had the present ability to apply force to a person. Defense counsel conceded that only element 2 was in dispute:

> "Willfulness is one of the elements of the crime and, for practical purposes, again it's really the only one that's in contention.
>
> " … [Element] one isn't in dispute. Certainly there was a danger of application of force to [Nora]. Certainly there's a present ability to apply force. That's [element] four. [Element] two, willfulness is of course the defense."

Defense counsel argued that defendant intended to get closer to Nora and park the vehicle so defendant could physically confront Nora. In the haste of doing so, defendant drove recklessly and mishandled the vehicle, but she did not intend to drive onto the sidewalk and into Nora. That only happened because the brakes and steering failed when defendant attempted to stop and park near the curb.

Defense counsel urged the jury to find defendant had not used the vehicle as a weapon, "Someone who loses control of a car because she drove aggressively and drove mad can't be fairly regarded in the same category as someone who really does seek to use the car as a weapon." He concluded, "[Y]ou cannot find her guilty of using an automobile as a deadly weapon [unless] you find her conduct was willful[,] and attempt[ing] to apply the brakes before the car ever gets on that sidewalk means her conduct in going up on the sidewalk [was] not willful."

---

**13** "Whether an object is a deadly weapon under section 245 does not turn on whether the defendant intended it to be used as a deadly weapon; a finding that he or she willfully used the object in a manner that he or she knew would probably and directly result in physical force against another is sufficient to establish the required mens rea." (*People v. Perez* (2018) 4 Cal.5th 1055, 1066.)

Therefore, whether the vehicle was a deadly weapon was not contested by defendant at trial. Had defendant wanted to dispute whether the vehicle was a deadly weapon, she could have done so. (See *People v. Merritt*, *supra*, 2 Cal.5th at p. 832 [" '[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.' "].)

In addition, the prosecutor's discussion of the missing element is a factor to consider in determining prejudice. (See *People v. Jennings* (2010) 50 Cal.4th 616, 678, citing *People v. Wade* (1988) 44 Cal.3d 975, 994 [the jury was not misled by omission of the intent-to-torture element in the torture-murder special-circumstance instruction, in part because the prosecution specifically explained to the jury that the special circumstance required an intent to kill].) Here, the prosecutor argued to the jury that defendant's vehicle was a deadly weapon under the definition in the trial court's instructions:

> "Now [CALCRIM No.] 875, … one of the final laws that is stated in [CALCRIM No.] 875 is the People must prove that a deadly weapon is any object, instrument or weapon that is used in such a way that is capable of causing and likely to cause death or great bodily injury. What's the deadly weapon used in this case? It's an automobile. An automobile by itself, everyone uses it every day. We drive to work. We drive home. We go to school, what have you. But the instruction says a weapon that is used in such a way that is capable of causing and likely to cause death or great bodily injury. And I'm not going to belabor this point, but if you use a car and you launch it at somebody and it heads towards their direction, that's a deadly weapon. It's an automobile. There should be no doubt that an automobile can be used as a deadly weapon if you try to run somebody down, without a doubt."

The prosecutor also emphasized that there was testimony defendant was driving more than 25 miles per hour, the testimony showed that Nora had to jump out of the way because "[i]f you launch a vehicle that's several thousand pounds and you accelerate, …

22.

it's going to apply direct and probable force to somebody, … and [Nora] had to jump out of the way to save her life," and defendant crushed Nora's scooter, which Nora had dropped when she jumped out of the way.

Moreover, the jury would have found the vehicle was a deadly weapon if it had been instructed properly. When a motor vehicle, being driven at a high rate of speed, is used to commit an assault, the vehicle, by virtue of its weight and power, is necessarily being used " 'in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' " (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028–1029.) "Several cases have recognized a vehicle as a deadly weapon based on the manner it was used." (*People v. Perez, supra*, 4 Cal.5th at p. 1065, citing *People v. Oehmigen* (2014) 232 Cal.App.4th 1, 6 [the defendant drove a car at two police officers]; see *id*. at p. 1067 [where the defendant continued driving a vehicle with victim's arm stuck in door, "[t]he evidence does not reasonably support any inference but that [the defendant] used the vehicle ' "in such a manner as to be capable of producing and likely to produce … great bodily injury"[ ']—i.e., that [the defendant] used the vehicle as a deadly weapon"]; *People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1183 [the defendant raced through a red light at a busy intersection and collided with another vehicle]; *People v. Russell*, *supra*, 129 Cal.App.4th at p. 787 [the defendant pushed the victim into the path of an approaching car].)

Defendant admitted she was driving 25 miles per hour, and William testified that defendant was driving at Nora going at least 30 miles per hour. He feared Nora would be hit and immediately yelled for her to get out of the way. William testified that Nora had to leap out of the way to avoid injury. Defendant hit the scooter that Nora left behind when she jumped out of the vehicle's path. There is no reasonable doubt that the jury found, or would have found, that defendant used the vehicle in a manner capable of causing and likely to cause death or great bodily injury, as required by CALCRIM No. 875. (See *People v. Brown* (2012) 210 Cal.App.4th 1, 13–14 [ample evidence that

the defendant used a BB gun in a manner capable of inflicting and likely to inflict great bodily injury, as well as arguments of counsel, left no reasonable doubt the jury found the defendant guilty on this basis].)

We conclude that any error in instructing the jury to determine whether the vehicle was a deadly weapon was harmless beyond a reasonable doubt and did not contribute to the verdict.

## IV. *The trial court did not err in failing to instruct the jury with simple assault as a lesser included offense of assault with a deadly weapon.*

The trial court instructed the jury on assault with a deadly weapon with respect to defendant's use of her vehicle. Defendant did not ask the trial court to instruct on the lesser included offense of simple assault. Defendant argues that there was substantial evidence that she did not drive her vehicle in a manner likely to produce great bodily injury or death, and therefore an instruction on the lesser included offense of simple assault was required. We disagree.

### A. Applicable Law and Standard of Review

"Under California law, trial courts must instruct the jury on lesser included offenses of the charged crime if substantial evidence supports the conclusion that the defendant committed the lesser included offense and not the greater offense." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196.) "A trial court must instruct the jury sua sponte on a lesser included offense only if there is substantial evidence, ' "that is, evidence that a reasonable jury could find persuasive" ' [citation], which, if accepted, ' "would absolve [the] defendant from guilt of the greater offense" [citation] *but not the lesser*' [citation]." (*People v. Cole* (2004) 33 Cal.4th 1158, 1218, first & fourth bracketed insertions added.) "[T]he existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)

Simple assault is a lesser included offense of assault with a deadly weapon. (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 747.)

"On appeal, we independently review whether a trial court erroneously failed to instruct on a lesser included offense." (*People v. Trujeque* (2015) 61 Cal.4th 227, 271.)

**B.      Analysis**

The question posed by defendant's claim is whether a reasonable jury could have found that defendant committed only simple assault and not assault with a deadly or dangerous weapon when she drove her vehicle at Nora. However, there was no evidence that defendant committed simple assault on Nora but did not also assault Nora with a deadly weapon, i.e., a vehicle driving at 15 to 25 miles per hour.

Defendant initially testified that she drove at Nora while accelerating to 15 miles per hour but then admitted that she had previously told the detectives that she was driving 25 miles per hour. She also testified that she intended to drive over to Nora and park at the curb, but her vehicle would not stop when she braked nor could she turn the wheel. William testified that defendant was driving at least 30 miles per hour at Nora and he immediately yelled for Nora to get out of the way, fearing she would be hit. Nora, William, and a neighbor testified that Nora had to leap out of the way to avoid injury. In addition, the evidence showed that defendant hit Nora's scooter and bent it so that it was nonoperational.

The evidence showed that defendant assaulted Nora by driving at her at 15 to 25 miles per hour, not hitting her only because she leapt out of the way. Defendant hit Nora's scooter, which Nora left behind when she jumped out of the vehicle's path. Common sense still dictates that driving a vehicle at someone, even at 15 to 25 miles per hour, is likely to produce great bodily injury. (Cf. *People v. Golde* (2008) 163 Cal.App.4th 101, 116–117 ["there is no way that driving a car toward a person can constitute simple assault but not assault with a deadly weapon" when the defendant drove

car toward victim at 15 miles per hour while victim tried to avoid car].)  If defendant had hit Nora, it was likely that Nora would have suffered great bodily injury.  That Nora was able to leap out of the way and defendant did not actually inflict great bodily injury was fortuitous.  It did not, however, negate the likelihood that great bodily injury would result if defendant had hit Nora.

Furthermore, if the jury accepted defendant's testimony that she did not willingly drive at Nora and only intended to park at the curb, defendant would have been acquitted. Therefore, if the jury believed that defendant assaulted Nora, it was because the jury believed that defendant willfully drove her vehicle at Nora at a high rate of speed and defendant's vehicle was a deadly weapon.

Based on the evidence, the jury could not reasonably have found defendant guilty of only simple assault and not assault with a deadly weapon.  Accordingly, the trial court did not err in failing to instruct on simple assault as a lesser included offense.  (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162.)

### C.    Harmless Error

Even assuming that it was error for the trial court to fail to instruct the jury on simple assault as a lesser included offense, we conclude defendant was not harmed by this error.

The failure to give a lesser included offense instruction in a noncapital case is, with limited exception not applicable here, a matter of state law to be reviewed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836.  (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)  Under *Watson*, " 'a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' "  (*Beltran*, at p. 955.)  The test " 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence

26.

supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Id*. at p. 956.)

Here, even if an instruction on simple assault had been provided, it was not reasonably probable that defendant would have succeeded in convincing a jury she had committed only the lesser offense of simple assault and not assault with a deadly weapon. As we noted above, this was a strong case for the prosecution, and the evidence that defendant drove at Nora at a speed of at least 15 miles per hour (but likely 25 or 30 miles per hour) was uncontroverted. Defendant testified that she was driving her vehicle over to Nora because she wanted to talk or fight with Nora and intended to park the car at the curb. Defendant claimed that her vehicle's brakes and steering malfunctioned when she attempted to stop and she did not intend to hit Nora or even scare her. If the jury believed defendant, she would not be guilty of either simple assault or assault with a deadly weapon. In closing, defense counsel conceded the other elements, arguing only that defendant had not acted willfully in driving the vehicle at Nora. If the jury disbelieved defendant, she could only be guilty of assault with a deadly weapon and not simple assault.

Therefore, the evidence showed that defendant's only act of assault was in the use of her vehicle and it is not reasonably probable the verdict would have been more favorable to defendant had the simple assault instruction been given. The jury would have found defendant guilty or not guilty of assault with a deadly weapon, but not of simple assault.

### D. Cumulative Error

Defendant also argues she was prejudiced by the cumulative effect of the trial court's errors. However, we have concluded that the trial court did not err in determining that defendant voluntarily absented herself from the trial, counsel was not ineffective, and

27.

the trial court did not err in not instructing the jury on simple assault. Accordingly, there is no cumulative effect to weigh. (*In re Reno* (2012) 55 Cal.4th 428, 483 [holding that each of the defendant's individual claims "cannot logically be used to support a cumulative error claim [where] we have already found there was no error to cumulate"].) Furthermore, "[t]o the extent there are a few instances in which we have ... assumed [the] existence [of error], no prejudice resulted. The same conclusion is appropriate after considering their cumulative effect." (*People v. Valdez* (2012) 55 Cal.4th 82, 181.)

## V. The lifetime revocation of defendant's driving privilege pursuant to Vehicle Code section 13351.5 does not violate equal protection principles.

During the sentencing hearing, the trial court ordered defendant to surrender her driver's license to the DMV and revoked defendant's driver's license for life based on her conviction for assault with a deadly weapon (§ 245, subd. (a)(1)), a motor vehicle. Defendant now argues Vehicle Code section 13351.5 violates her equal protection rights under the state and federal Constitutions because there is no rational basis for the automatic lifetime bar of defendant's driving privilege. We reject defendant's constitutional challenge.

Vehicle Code section 13351.5 requires lifetime revocation of the driver's license of a person who has been convicted of assault with a deadly weapon (§ 245) by means of a vehicle. Vehicle Code section 13351.5 provides in relevant part:

> "(a) Upon receipt of a duly certified abstract of the record of any court showing that a person has been convicted of a felony for a violation of Section 245 of the Penal Code and that a vehicle was found by the court to constitute the deadly weapon or instrument used to commit that offense, the [DMV] immediately shall revoke the privilege of that person to drive a motor vehicle. [¶] (b) The [DMV] shall not reinstate a privilege revoked under subdivision (a) under any circumstances." (Veh. Code, § 13351.5, subds. (a), (b).)

" 'The equal protection guarantees of the Fourteenth Amendment and the California Constitution are substantially equivalent and analyzed in a similar fashion.

28.

[Citations.]' [Citation.] We first ask whether the two classes are similarly situated with respect to the purpose of the law in question, but are treated differently. [Citation.] If groups are similarly situated but treated differently, the state must then provide a rational justification for the disparity." (*People v. Lynch* (2012) 209 Cal.App.4th 353, 358, second & third bracketed insertions added.) Defendant argues that in enacting Vehicle Code section 13351.5, the Legislature distinguished between two groups of people convicted of crimes involving motor vehicles. The first group includes those convicted of felony assault with a deadly weapon (§ 245), where the weapon is a vehicle. Their driver's licenses are automatically revoked for life pursuant to Vehicle Code section 13351.5. The second group, which defendant argues is similarly situated to the first group, consists of those convicted of equally or more dangerous vehicular crimes who are not subject to a mandatory, lifetime revocation of their driver's licenses.

Assuming, without deciding, that violators of the two groups of vehicular crimes are sufficiently similarly situated with respect to the purpose of the law in question (Veh. Code, § 13351.5) but are treated differently, we must determine whether there is a rational justification for the disparity in treatment of the two groups. We must consider whether there is a rational justification for imposing a lifetime driver's license ban pursuant to Vehicle Code section 13351.5 on those in the first group who commit felony assault with a deadly weapon (§ 245) by means of a vehicle, and not imposing such a severe penalty on all others who commit vehicular crimes.

"Where, as here, a disputed statutory disparity implicates no suspect class or fundamental right, 'equal protection of the law is denied only where there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose." ' " (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881.) " 'This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated. [Citation.] … [A] court may engage in " 'rational speculation' " as to the

29.

justifications for the legislative choice [citation]. It is immaterial for rational basis review "whether or not" any such speculation has "a foundation in the record." ' [Citation.] To mount a successful rational basis challenge, a party must ' "negative every conceivable basis" ' that might support the disputed statutory disparity. [Citations.] If a plausible basis exists for the disparity, courts may not second-guess its ' "wisdom, fairness, or logic." ' " (*Ibid*.)

Defendant asserts the legislative history of Vehicle Code section 13351.5 fails to discuss the rationale for the classification and or show a plausible reason for the classification.[14] Defendant argues the classification is irrational in the statutory scheme because the offense of assault with a deadly weapon (§ 245, subd. (a)) by means of a vehicle is the only vehicular crime requiring the mandatory, lifetime revocation of a defendant's driving privilege under Vehicle Code section 13351.5. Other drivers, who "commit equally dangerous and heinous vehicular crimes," are not so treated.

Despite the lack of legislative history, the People provide a plausible reason for imposing the mandatory, lifetime revocation of a defendant's driving privilege only on those who commit assault with a deadly weapon (§ 245) by means of a vehicle. The second group of vehicular crimes do not require a finding the defendant *intentionally* used a vehicle as a means of harming another person. The second group of crimes includes violations of vehicular manslaughter (Veh. Code, § 13351, subd. (a)(1)), causing serious bodily injury (*id*., subd. (a)(3)), and three or more convictions in one year for hit and run, reckless driving with injury, or vehicular manslaughter while intoxicated (*id*., subd. (a)(2)). Conviction of these crimes results in a three-year mandatory suspension of driving privilege.

---

[14]     On December 7, 2020, defendant filed a request that we take judicial notice of the legislative history underlying amendments to Vehicle Code section 13351.5. We grant this request. (See Evid. Code, §§ 452, 459; Cal. Rules of Court, rule 8.252.)

We agree with the People that this distinction between the two groups provides a plausible reason for the classification and different treatment under Vehicle Code section 13351.5. Driving is a privilege, not a right. (*People v. Linares* (2003) 105 Cal.App.4th 1196, 1199 (*Linares*).) A serious, *intentional* abuse of the driving privilege by using a vehicle as a weapon constitutes a rational basis for permanently taking away the right to drive from those who intentionally use a vehicle to harm others. Vehicle Code section 13351.5 protects the public from those who pose a risk of committing assaults by means of a vehicle, based on their past history of committing such acts.

Because there is a rational justification for the disparity between permanently revoking the driver's licenses of those who commit assault with a deadly weapon (§ 245) by means of a vehicle and not imposing such penalty as to all other vehicular offenses, we conclude Vehicle Code section 13351.5 is constitutional, facially and as applied to defendant.

## VI.     *The trial court erred in ordering the revocation of defendant's driving privilege.*

Revocation of a defendant's driver's license under Vehicle Code section 13351.5 is a mandatory administrative function. (*In re Grayden N.* (1997) 55 Cal.App.4th 598, 604.) "Simply put, the … court is bound, under the statute, to report to the [DMV] the true finding [defendant] committed an assault with a deadly weapon in violation of Penal Code section 245, subdivision (a), and the true finding the weapon … used was a vehicle." (*Ibid.*) License revocation is a civil, not a criminal, sanction. (*Linares*, *supra*, 105 Cal.App.4th at p. 1199.) The DMV, not the court, has the power to administratively suspend or revoke a driver's license under Vehicle Code section 13351.5. (*In re Grayden N.*, at p. 604; *Larsen v. Department of Motor Vehicles* (1995) 12 Cal.4th 278, 284 [the act of the DMV suspending a driver's license pursuant to Vehicle Code sections authorizing them to do so is an administrative act in performing a mandatory function and

31.

the DMV, having received an abstract of record, is simply required to suspend the defendant's driving privilege].)  The DMV's suspension or revocation of defendant's driving privilege under Vehicle Code section 13351.5 is substantively distinct from any punishment a court may impose as a result of a criminal conviction.  In other words, the DMV's lifetime revocation, imposed pursuant to Vehicle Code section 13351.5, is an administrative civil sanction that is independent of the trial court's penal sanction.

Furthermore, the Legislature plainly did not intend the trial court to suspend or revoke a driver's license under Vehicle Code section 13351.5, as the court purported to do here.  Division 6 of the Vehicle Code (Veh. Code, § 12500 et seq.), which deals with driver's licenses, contains a chapter covering suspension or revocation of licenses on all possible grounds (ch. 2; Veh. Code, § 13100 et seq.).  This chapter consists mostly of two articles:  article 2 (Suspension or Revocation by Court; Veh. Code, §§ 13200–13210) and article 3 (Suspension and Revocation by Department; Veh. Code, §§ 13350–13392).  "[T]he DMV, not the court, is empowered to revoke a driver's license."  (*Linares*, *supra*, 105 Cal.App.4th at p. 1199.)  The trial court, however, is empowered under Vehicle Code section 13351.5 to refer the matter to the DMV for suspension or revocation.

For driver's license revocation or suspension under Vehicle Code section 13351.5 to occur, the DMV must receive a certified abstract of record, which shows not only that the defendant was convicted of assault with a deadly weapon (§ 245), but also that the trial court found the defendant used a vehicle as "the deadly weapon or instrument" in committing the offense.  (Veh. Code, § 13351.5, subd. (a).)  Here, the trial court's minute order does not show this.  Thus, if the abstract of record were provided to the DMV, it would give the DMV no basis to suspend or revoke defendant's driver's license.  Because only the DMV has the statutory authority to suspend or revoke defendant's driver's license, and the trial court's minute order does not include the finding required for the DMV to revoke or suspend defendant's driver's license under Vehicle Code section 13351.5, the trial court's minute order must be modified to reflect the trial court's

finding that defendant used her vehicle as a deadly weapon to commit the section 245 assault.

The trial court's order revoking defendant's driver's license must be stricken from the minute order because the trial court did not have authority to revoke defendant's driver's license under Vehicle Code section 13351.5.

## VII. *Defendant forfeited any objection to the search of handheld electronic devices by failing to object when sentenced.*

Defendant argues that the electronics search condition of her probation is constitutionally overbroad. The People argue that defendant forfeited her objection to the condition by failing to object to the language and condition below. We agree.

### A. Background

The trial court placed defendant on formal probation for three years and included a condition that required defendant to submit to a search of any handheld electronic devices. The trial court explained:

> "The reason I order that is that if there is going to be any type of threats or any other type of contact—it was made through the phone on this occasion. It was a device that was utilized in the assistance of committing this offense. So the Court feels it's important for Probation to be able to determine whether or not [defendant is] involved in any type of criminal conduct such as what occurred in this case. So the search for the hand-held electronic device is limited for those purposes."[15]

Defendant did not object to this condition.

### B. Analysis

"The Legislature has placed in trial judges a broad discretion in the sentencing process, including the determination as to whether probation is appropriate and, if so, the conditions thereof. [Citation.] A condition of probation will not be held invalid unless it

---

[15]  The trial court's May 4, 2020 minute order describes the search condition simply as: "*Submit person and property to search and seizure.*" We shall order the trial court to amend the minute order to reflect the court's limitation on this search condition.

33.

'(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality ….' [Citation.]  Conversely, a condition of probation which requires or forbids conduct which is not itself criminal is valid if that conduct is reasonably related to the crime of which the defendant was convicted or to future criminality." (*People v. Lent* (1975) 15 Cal.3d 481, 486, fn. omitted (*Lent*), superseded by statute on other grounds as stated in *People v. Moran* (2016) 1 Cal.5th 398, 403, fn. 6.)

A defendant who believes a proposed probation condition is unreasonable must timely object to the condition in the trial court.  (*In re Sheena K.* (2007) 40 Cal.4th 875, 882 (*Sheena K.*); *People v. Welch* (1993) 5 Cal.4th 228, 235 (*Welch*).)  A timely objection provides an opportunity for the parties to present argument or evidence concerning the need for the condition and for the court to modify the condition if necessary.  (*Welch*, at p. 235.)  A defendant who fails to make a timely objection in the trial court typically forfeits any such argument on appeal.  (*Id.* at pp. 234–235.)  There is an exception to the general rule where a defendant raises a facial challenge involving a pure question of law capable of resolution without any reference to the trial court record. (*Id.* at p. 235; *Sheena K.*, at p. 887.)

Defense counsel posed no objection to the condition that defendant submit to the search of her handheld electronic devices.  Defendant now argues that the search condition "permits unfettered governmental access to her hand-held electronic devices— which includes all information stored on, or that can be obtained from, her phone." Defendant also argues that she did not forfeit this objection because it is one of pure law without regard to the sentencing record.  We disagree.

As our Supreme Court recently noted, imposition of an electronics search condition is not improper, in itself, even when broadly imposed.  (*In re Ricardo P.* (2019) 7 Cal.5th 1113, 1124, 1128–1129.)  Rather, under either *Lent* or a pure overbreadth

analysis, the question is whether, on the record, the imposition of such a condition is reasonable. (*Ibid*.) That analysis falls squarely under the forfeiture rule set forth in *Welch*. (*Welch*, *supra*, 5 Cal.4th at p. 237 ["We therefore hold that failure to timely challenge a probation condition on '[*In re* ]*Bushman*[ (1970) 1 Cal.3d 767]/*Lent*' grounds in the trial court waives the claim on appeal."].)

Defendant asserts a probation condition impinging on a fundamental constitutional right must be narrowly drawn, but her analysis relies on *In re Ricardo P.*, *supra*, 7 Cal.5th 1113 and its application of *Lent*, *supra*, 15 Cal.3d 481 to handheld electronic devices. Defendant also argues that the trial court's stated nexus between the crime and the search is fundamentally flawed. Thus, the import of defendant's arguments becomes whether that condition was appropriately tailored to her situation given the record developed. Such is specifically the type of analysis our Supreme Court has stated requires an objection to preserve as this contention necessarily requires consideration of the trial court record; defendant should have raised her objection to the trial court. (See *Sheena K.*, *supra*, 40 Cal.4th at p. 887 [exception to forfeiture rule where challenge does not require "reference to the particular sentencing record developed in the trial court"]; *Welch*, *supra*, 5 Cal.4th at pp. 234–235 [timely objection allows for additional evidence, argument, and potential modification of the condition].)

In addition, in *People v. Patton* (2019) 41 Cal.App.5th 934, our sister court concluded the electronics search condition there was not facially overbroad, and held that "[a]ny challenge to the closeness of fit between the condition and facts related to [the defendant's] crime or history is an as-applied constitutional claim, forfeited by [the defendant's] failure to object on that basis before the trial court." (*Id*. at p. 938.)

Defendant's failure to object thus has forfeited this issue on appeal. (*People v. Patton*, *supra*, 41 Cal.App.5th at pp. 946–947.)

### VIII. *Defendant's term of probation is reduced to two years pursuant to section 1203.1, subdivision (a).*

Effective January 1, 2021, Assembly Bill No. 1950 (2019–2020 Reg. Sess.) (Assembly Bill 1950) amended section 1203.1 to limit the maximum probation term a trial court is authorized to impose for most felony offenses to two years. (Former § 1203.1, subds. (a), (m), as amended by Stats. 2020, ch. 328, § 2.)[16] "[T]he … limitation[s] on … probation set forth in Assembly Bill No. 1950 [are] ameliorative change[s] to the criminal law that [are] subject to the [*In re*] *Estrada* [(1965) 63 Cal.2d 740] presumption of retroactivity." (*People v. Sims* (2021) 59 Cal.App.5th 943, 964; accord, *People v. Quinn* (2021) 59 Cal.App.5th 874, 883–885.) Therefore, the amendment to section 1203.1 applies to all cases not final on Assembly Bill 1950's effective date. (*Sims*, at p. 964.)

Defendant's case was not final on January 1, 2021, and she was sentenced to a term of felony probation exceeding two years for an offense that is not a violent felony exempted from the two-year limit on felony probation. (See §§ 1203.1, subd. (*l*), 667.5, subd. (c).) Defendant is therefore entitled to the benefit of Assembly Bill No. 1950. The People concede as much.

Both parties request that we remand this matter to the trial court to reduce the probation term. However, defendant's term of probation expired on May 4, 2022. (§ 1203.1, subd. (a).) Under the circumstances of this case, the parties fail to persuade us that remand for resentencing is necessary or an appropriate use of scarce judicial resources. Therefore, we shall modify defendant's term of probation to two years. (§ 1260; *People v. Quinn*, *supra*, 59 Cal.App.5th at p. 885.)

---

[16] Subsequently, Assembly Bill No. 177 (2021–2022 Reg. Sess.) effected changes to section 1203.1, provided for repeal of the section on January 1, 2022, and then added section 1203.1, effective January 1, 2022. (Legis. Counsel's Dig., Assem. Bill No. 177 (2021–2022 Reg. Sess.) Stats. 2021, ch. 257, §§ 21–22.) Those changes are not relevant to the issue raised in this appeal.

**DISPOSITION**

In accordance with Assembly Bill 1950, defendant's three-year probation term is reduced to two years and the trial court is directed to amend its records to reflect this modification. In addition, (1) the trial court's order revoking defendant's driver's license is reversed and the trial court is directed to amend its May 4, 2020 minute order to delete the language, "DMV to Revoke Drivers License for a period of [*sic*] As to count(s): 001."; (2) the trial court is directed to insert into the same minute order a statement that defendant was convicted of a felony violation of section 245 and the court found a vehicle constituted the deadly weapon or instrument used to commit the offense; (3) the trial court is further ordered to forward a certified record of defendant's conviction and the court's finding that the deadly weapon or instrument was a vehicle to the DMV; and (4) the court is ordered to amend the same minute order to reflect that the search and seizure probation condition as to the search of handheld electronic devices is limited to a search for threatening communications indicative of assault or assault with a vehicle, and only in those portions of the devices likely to reflect such communications.

The judgment is otherwise affirmed.


                                                                        HILL, P. J.

WE CONCUR:


PEÑA, J.


SMITH, J.


37.